All right, welcome to our February sitting here in the West Courtroom. I'm extremely honored to be sitting with Judge Carolyn King, former chief judge of our circuit from Houston, and one of our resident judges, Judge James Dennis. So the Louisiana judges are tipping the scale here a little bit, but Texas is our biggest customer, so we will ably rely on our Texas colleague to help us meander. I know at least the first ones are veterans of this, so they don't need the rules, but for anybody else out there, probably the most off not followed is just staying in the microphone. That's not a problem with the first crew coming up, but we like to make sure we hear what you say and we do record the argument, so make sure that you stay in. Somewhere, if anybody in the courtroom with a later case, we'll probably take a recess somewhere midway between these cases, but I'll give you a heads up when that's the case. All right, we have read in this electronic age not only the briefs, but quite a bit of the record, PSR, and ho schmeal, so we know what the cases are about, so if you focus on answering the questions, that will help us a lot. All right, first case up, United States of America v. Barazza-Corral. Ms. Daugherty? Good morning. My name is Elizabeth Daugherty. I'm the attorney for the appellant, Mario Barazza-Corral. I will refer to him as Mario. He pled to one count of distribution of methamphetamine under 841B that carries a mandatory minimum of five years. In January of 2016, Mario was sentenced to 108 months. That was the low end of the sentencing guidelines, and it was based in part on an enhancement of two points for an aggravated role under 3B1.12 as a leader of a criminal activity of less than five people. So this morning, we raise in issues for conversation under the plain error review. The first error that we raise is procedural. You are not trial counsel, right? No, sir, just appellate. Okay. The first error . . . I was wondering about these vanishing objections. Yes, sir. We get more plain error cases up here. Things take on all this gargantuan proportions, but nobody preserves the issue. But anyway, just . . . I'm with you there, sir. . . . just ruminating. The first error that we raise is procedural, and the district court, we assert, erred in using 3.1.B.1.C based on criminal activity of less than five participants, as I said. Now, this court in Gomez-Baillat, and that is 828, Fifth Third, 324, pointed out that the average participant in a criminal activity involved people who actually participate in the crime. Now, Gomez-Baillat actually was addressing the mitigating role, but it's all under 3.B.1. So we would suggest that the notion of a criminal activity be consistent both with an aggravating role and a mitigating role. And what the district court did was look at the one count that Mario pled to, and that was count 11, the distribution of the methamphetamine. And in count 11, it is alleged that Mario and his brother, Omar, aided and abetted a fellow by the name of Castillo, who was the distributor to his downstream network. So in that regard, the district court used a three-person criminal activity, apparently, or something less than five, and applied an aggravating role for a two-point enhancement. Now, although Mario's duties are distinct from Omar and Castillo, even in the little blurb of the count in the indictment, Mario aided and abetted. It was Castillo's network. Castillo was the one that distributed the drugs. So the duties are, in fact, distinct, but having just a small network of three people when, in fact, the criminal indictment is with nine total defendants is unfairly prejudicial. We respectfully suggest against Mario to carry his burden as we judge the level of his culpability in this appeal. We suggest that the criminal enterprise now be the nine co-defendants that are actually in the indictment. Under this scenario we have, you see the complete picture of an existing meth ring that was run at Delta Downs using the Delta Downs stables, if you will, as their stash. And you have in this scenario, you've got Omar, you've got Castillo, and a fellow by the name of Cribiero, referred to as the Cuban, who actually ran their own separate networks. They had downstream distributors, downstream purchasers. Obviously money came back upstream through them, and what they would do is they would hit on Mario to supply him with some more drugs. We need some more drugs. So the connection there is that, for example, that's Castillo's case. For example, this fellow, the Cuban, Cribiero, he had his own independent drug ring. There was no authoritative figure that said, you must work in lockstep with me. You've got this Cuban who not only hits on Mario, I need more drugs, I need more drugs, but he goes down. The essence of your argument, you're saying he wasn't a manager, an organizer, he was just somewhere out there. Is that the thrust of this part of the argument? This part of my argument, I'm trying to impress upon you that the criminal activity should include nine people, because when it includes nine people, then you actually see the size and the scope and the setup of the activity. I get it, but you're on appeal. So the question is where are you saying the error was, because that's not what happened in the appreciation of this whole enterprise below. I get it, you're painting this landscape, but you're on appeal. So as to this issue, where are you saying the error was and how, particularly given, as mentioned, that it's plain error? And then you've got the sentencing issue, so I'm just trying to move you down the road a little bit to where I thought the pressure points were. The procedural error that we raise at first is that the court assumed that the criminal activity was only three people as opposed to nine in the indictment. Why do you say the court assumed that? Because in the aggravated role, he invoked 3B1.1C, which requires a criminal activity, a criminal unit of less than five people. And I'm saying, I'm not arguing for the enhancement. My second argument is that we need a mitigating role here, but the procedural error is, in fact, that the court viewed the criminal activity just from count number 11 as opposed to the entire indictment of nine people. I'll go back to where I started, even though I know what you said. You're a court-appointed and you weren't there, but these things are so glaring. The whole point of the objection is the judge makes a mistake. Somebody objects and points it out. If it's procedural, the judge looks at what's correct. Nobody objects. It's neon lights here. But then when we get up here on appeal, then it's like, okay, sort of gotcha. I'm not saying you lose because of it. I'm just sort of saying you're starting out of the gates with this issue of this apprehension of the conspiracy and the guidelines and this and that, where a well-placed objection brings to light, okay, if it is there, let's move on. So instead, the argument is, well, we ought to fix it up here. Just a little consternation about that. I mean, you argued it. But anyway, I get it. Okay, we got you on that one. Let's get to where— The second one, and then we'll get to the second one. Yes, sir. So following my second issue, following the threat of Amendment 794, the Commission encourages the courts, where appropriate, where appropriate now, to use the 3B1.2 mitigating role feature more regularly, more consistently. And this court in Castro, a case decided after my case, laid out a clear scenario for determining the eligibility of a mitigating role. And that is, first of all, what is the culpability of the average participant, the culpability of the average participant in this crime. And second of all, the defendant must carry the burden to show that he is substantially less culpable than the average. Now, under the criminal activity of nine people, you've got your average participant, if you look at the activity of Cribiero, Castillo, and Omar, they were in the established ring. This was going on. They had their own downstream network. The Cuban actually had his own source. He didn't always use drugs from Omar and Mario. So these three demonstrated— Your client was the supplier. My client was the fellow who—he actually brought the drugs 310 miles of the trip from New Mexico up to Dallas. He was the line from Dallas to Delta Downs, which is about 310 miles. He made that trip five times in about six months. He joined the ring in December 2012 and was arrested in July of 2013. My point is that when you compare his activities to the activities of these guys that I call average participants, I can't help but think of the relationship of a tangent line to a circle. He is tangential. He is right here. He is a peripheral— We have had some cases recently. One of our common scenarios is the mule who transports the drugs, usually in West Texas. All he does is carry them, and the argument has been made, you need to take into account the fact that all he is there for is just literally transporting them. He didn't get them. He didn't—you know, he has—there's been no showing that he did, and that has not been a successful argument. Well, this is not a Torres Hernandez case at all where—Torres Hernandez, you had 10 of these guys who carried—walked the same way, the same backpacks, with the same amount of drugs together across the border, and this court was right to say, no, no, no, you can't just say you're a courier for the big Mexican ring. What you have to do—we are going to look at your enterprise. Your criminal enterprise was the act of walking across the border, each of you aiding and abetting each other in the same manner. You are equally culpable here of criminal activity. That's not the case in the Delta Downs scenario. What we have is Mario. He gets hit from one side. Castillo runs out of drugs. Quibiero runs out of drugs. I need more drugs. And so he goes—he contacts the Mexican who smuggles and sends him up to his place. He drives him back down and fills up the barns at Delta Downs. There is absolutely no indication that he even has a salary. He's there to try to make his brother whole to save his brother's life. No indication in the record that he collected any money. He just is kind of like this wall when the Mexican calls and says, look, what's going on? Move the drugs. You still say the determination of the point you're arguing is a factual determination, which the district court made, to which you make a very coherent argument. It ought to be something different. But it's a fact argument. The district court made an assessment of his role, da-da-da-da-da. No objection. It's some plain error. So the question is, okay, not why isn't there a different way to look at it, but why is it reversible error? But then more to the point, I thought your bigger issue was on the sentencing matter, and you've got a minute and 17 seconds, and I don't think you have dealt with that. On the sentencing, the failure to mitigate, the failure to award a mitigating role is what we're arguing in the second point. And my point is that his culpability is substantially less, that the average participants in this role are Omar Castillo and the Cuban, and that Mario is simply tangential. He's a peripheral actor. To think that he could come in to an established drug ring, a meth ring, and assume a leadership role when these people are hardened drug criminals, he's nothing more than a contractor. He doesn't even live in Fenton. He lives in Dallas. He has his own contracting business. He's married with two children. So he's not a part of this ring. He is peripheral. He is tangent to the circle of the Delta Downs meth ring. And for that reason, he is substantially less culpable, and we say that the court erred in not awarding the mitigating role, and that error is plain error under the standard. It is an error. It is plain, as enunciated by Amendment 794. It affects his substantive rights because it actually shifts his sentencing guidelines down enough. And we said in Molino that a change in the sentencing guidelines window gives you a reasonable probability that your sentence will be lower. Ms. Dougherty, we have your argument. You've reserved rebuttal time. Thank you, sir. Thank you. We'll hear from Ms. Doming for the government. May it please the Court. I'm Camille Doming. I'm peering for the United States, who's the appellee in this matter.  on Chief Judge Stewart's comments about how we are here on plain error. And to whatever extent the parties disagree about a lot of things in this case, the thing we do agree on is that, at best, the issue, the arguments in this case, the issues, the determinations are reviewed under the plain error standard. And I say at best because the United States has cited in its brief what's sometimes called the Lopez Rule. I cited the Claiborne case, which, in two concurring opinions, discusses in great detail the pros and cons of the Lopez Rule. But basically it's a rule that this circuit has followed for over 20 years that factual determinations capable of resolution in the district court upon proper contemporaneous objection cannot be plain error. And many cases, including Claiborne, actually say that review is foreclosed on appeal. And so that is our first position. Let me tell you what. Every time I see that, every time I see that, that case gets cited to us all the time, and it's very rarely relied on. I mean, people, the judges just sort of think, well, is there some other way we can decide this case? So, I mean, at least that's my sense of it. No, I agree, Judge. It's true that there are, that, I mean, we — It would never be plain error. I mean, I don't know that I would make that statement about anything. That's true. And that's one of the criticisms that Judge Prado makes in his concurring opinion in Claiborne, that this is a rule or it's a line of cases, but it's often not followed by the court. And I think that what often happens is, and I know I do it in my briefs, I cite the rule because, as we stand here, it hasn't been expressly rejected in a published, you know, an en bas opinion of the court. We cite it, but we go ahead and make a plain error argument, and that's what I'm basically here to do today. But, again, I'll echo Chief Judge Stewart's comments, that when we're talking about plain error review of a factual determination, you know, we keep in mind that clear error review is exceedingly deferential to the district court, that our cases say that something is not clearly erroneous as long as it is plausible in light of the record as a whole, the record as a whole. So for a factual finding to be plainly erroneous, it would have to be worse than that. So we're basically talking about factual findings that the defendant could have challenged in the district court. The defendant was represented in this case by experienced criminal defense counsel at the trial level. The PSR was issued well in advance. These are points that Judge Jones makes in her concurrence in Claiborne. This was not a mystery that the defendant was going to be tagged with this two-level enhancement for a leadership role. Obviously, he could have objected. He could have — he had an obligation, if he objected, to put on rebuttal evidence. If he had done so, then the United States would have had an opportunity perhaps to develop these points. And I think if there had been a proper objection and the district court had sort of gleaned different inferences from these facts plus others, that, you know, it would be difficult for me to challenge that ruling on appeal. And that's because of the authority, the discretion, the deference given to district courts in making factual determinations. The case I cite in my brief is IZMOILA, which stands for Proposition Cited Hundreds of Times, that the district courts can make these leadership role determinations inferentially from the facts. They can infer things from the facts. And that obviously is what the district court did in this case. I want to — I'll get back to the issue of the merits of the leadership enhancement under the plein air standard in a few minutes. I want to touch briefly on what counsel spent a lot of time in her argument on, and that's this so-called procedural error. I think counsel's argument is that the district court used 3B1.1c, which provides for a two-level enhancement if you're a leader, organizer, manager, supervisor. So if you're any of those things, you get — of a criminal organization or a criminal activity, I'm sorry, of five — of less than five participants. If you have more, then that kicks you to 3B1.1a or b. And you have four levels if you're a leader, organizer, and you have three levels if you're a manager, supervisor. The United States' argument is that even assuming that was error, to use subsection c instead of subsection a or b, because the court counted fewer people than it should have, that is an error that benefits the defendant because it produced a lower advisory guideline range. If the court had used subsection a, it would be two levels higher. If the court had used subsection b, it would be one level higher. So the court would start from a higher point. The district court in this case did tie its sentence to the advisory range. If you look at ROA 198, that's where the court says, I'm giving you the low end of the guidelines only because you don't have a prior history, because this is a whole lot of — I think he says stuff, but from context he's referring to the quantity of drugs. So we suggest that even if that's argument — I mean, even if it's error, even if it's plain, it doesn't affect substantial rights because that error benefited the defendant. That's the kind of thing on which the United States could have filed a cross appeal, could have tried to get a higher offense level, and we have not. So we would argue that that's an error, if at all, that benefits the defendant. If that's so, could that have been a strategic determination that experienced counsel below made? And why not make it an objection if counsel perceived what you say to be true, that the error, although arguably there, may have benefited his client, could that have been a strategic determination, not that he was negligent or otherwise, and not objecting, but — I'm not saying nobody argues that, but thought occurs to me if you say he was well represented. Absolutely. And, you know, it's hard to stand here and second guess why counsel didn't raise an objection, but it could easily be that he thought, let's quit while we're ahead. And I'll get to this in a few seconds, but we're — and I'll go ahead and talk about it now. We're talking about a defendant who, as Judge King points out, was a source of supply. Now, the defendant argues in his brief and in his reply brief, you know, sort of some mitigating factors, that, well, he wasn't always the source of supply. He became the source of supply later on because he was trying to help out his brother, and it was for a more limited period of time, and it was only a limited number of loads in which he was the source of supply. I would suggest to the Court that none of that matters under 1B1.1. Those kinds of considerations — and I would also point out, look at ROA 196. Those facts, that he was helping out his brother, that he got involved late in the game, those facts were brought out by defense counsel in an argument in mitigation of sentence. Those particular things at ROA 196 are not in the PSR. Those are not specifically the facts on which the district court opted to award the leadership enhancement. Those were arguments made by counsel in mitigation of sentence where they properly belong. You know, the drug quantity would account for how long a defendant might be involved in a conspiracy, but not the leadership enhancement. So he's the source of supply. The PSR sets forth the sort of summary of conversations that were taken from wiretaps. There were two different wiretaps in this case, and obviously they captured telephone conversations as well as some text messages. So there's text messaging between this defendant, Barraza-Corral, and his brother, Omar, talking about one of their distributors, Sergio Castillo. Has Sergio paid you for the drugs yet? No. Well, maybe we need to do something with Sergio. Maybe he needs physical harm. And then Omar says, I know somebody who will break his fingers. And then Mario Barraza-Corral, the defendant in this case, says, that's what we need. We need somebody to break his fingers so he won't take what's not his. These are the kinds of conversations that managers, supervisors, leaders, organizers have. These are not the conversations that very low-level people who don't have some sort of managerial authority in a criminal activity have. They talk about, Mario talks about in one of the conversations cited in the PSR, can you find anyone who can work? The defendant in his reply brief says, well, you know, work is an innocuous thing. Again, we're talking about the district court's authority, particularly without a contemporaneous objection, to infer that work means drug trafficking, not selling insurance or, you know, doing some other kind of legitimate work. Work meant drug trafficking. And Mario, on the telephone with Omar, says, can you find someone who's willing to work? There's another part of the PSR that talks about a conversation that, or I think it's text message exchange, between Mario and the Mexican source of supply. Mario has a Mexican connection. That's not something that a lower-level person in a conspiracy would have. That's the sort of connection that someone higher in the conspiracy would have. He's got the Mexican connection. And so they're going back and forth, well, how's it going? Anybody working? There's sort of an allusion to someone, Jose Perez, who was murdered. Well, since it happened, there's only a passing reference to that in the PSR, but you sort of get the feeling that they're talking about something that happened and how it affected the business. The Mexican supplier talks about we've adjusted the price. Again, these are the kinds of conversations that leaders, organizers, managers, supervisors have, not low people in an organization, which sort of brings me to my last point, and that's to address whether this defendant should have been awarded the 2B, I'm sorry, the 3B1.2 reduction for a minor role. First, I would suggest it's going to be very hard for him to get that on plain-error review. It's his burden, so that's the sort of thing on which he would have carried the burden in the district court to bring forth facts that would entitle him to that reduction. But more importantly, Judge King, as you point out, there are cases in the circuit, and post-Amendment 794, Torres-Hernandez is a case in which this court affirmed the district court's refusal to award a minor participant reduction to a courier, a mule, who transported one backpack of marijuana across the border. Now, he did it in connection with some other people, but again, he's operating as a mule on one occasion, bringing one backpack of marijuana across the border. There are other cases involving mules. This defendant, who is a supplier, who's talking to the Mexican Connection about prices, we're lowering the price, I'll see what I can do, is anybody working, what are we going to do about Omar, maybe we can break his fingers, that's not a minor participant. And if the members of the Court have no further questions, I thank you very much. Thank you. Back to you, Ms. Torrey. A couple of points, Your Honor. If Mario were a leader, he would not be asking Omar to drum up other people in his distribution network. He would be on the phone, you would have wiretaps of Mario speaking to other people in this ring. He is not listed in the wiretapping portion of the indictment. Castillo is, Omar is, Mario is nowhere. His T3 taps are only to Omar. Second of all, this is conversations that are going on between brothers. So you say things on the telephone, he's sitting there trying to save his brother, trying to get him out of whatever hole the brother has lived in. So you can't just peg an emotional conversation with a brother as a chip to support the notion that he is a leader of a ring. What's your best case that this factual difference you have about what the district court found in this plain error context is reversible error? I mean, we get your argument in terms of how you urge a different scenario than which was found. But I just bring you back to where we're assuming that was there. But if the district court made a different determination, it's a fact matter. And I'm just, hold it. Hold it. I'm sorry. I'm just asking you, rather than retelling us those facts, what is your best case in a factual scenario, not identical to this but where somebody is urging a different view of the facts in this context, is reversible error in the plain error context? I'm asking for a case, not argument. What is your best case that would say this panel has to reverse or vacate based on the tenor of the argument you're making? That's all I'm asking. I would suggest that since the implementation of Amendment 794, that this case is ripe to be the first case where this court would— Are you saying this is a matter of first impression? No, sir. I'm saying that under Amendment 794— I may have misapprehended, but I sure thought I asked you, what is your best case? I have none. I have none for you, sir. Thank you. That helps to at least answer my question and then tell me something else. I just asked. I said, what is your best case? And you're candid as the court appreciates that there really isn't one. Now I can appreciate the rest of your argument. I just want to make sure we're not overlooking something in this scenario that there's some case that puts this in the zone of plain error to where you can say, well, his substantial rights are affected. Now what about the argument Counsel Opposite made that even with respect to your argument about which part of the guidelines, assuming there was error, Counsel Opposite's argument is that the opposite would have actually benefited the defendant because he would have otherwise be subject to an even higher enhancement rather than what he got, a three- to a four-level increase rather than the two-level that he got. So our response to that is that he is not—the facts do not support that he carried in any way a leadership or managerial role. It could very well be. So there would be no enhancement under the aggravation. It could very well be that this court determines that he has not carried his burden or we have not carried the burden to show that he is worthy of a mitigating role. But in that instance, we say the court did err in applying the aggravating role, and we still believe that it is a plain error. It meets the standard. It is a plain error. Under the 794 Amendment, which encourages the courts to look at a criminal activity where everybody participates in that criminal activity, we believe that the guidelines range will be one less than he's sentenced now. And under the Molina case, that's a reasonable probability that he will get a lower sentence. Now, I do want to say—I do want to say that the district court sentenced him to the low end. May I have a brainstorm with four seconds left on your clock? Oh, no, sir. It was an admission, but I was—a reasonable probability. Yes, sir. I'll give you a simple—I will give you a declarative sentence finish. If you can tell me in a declarative sentence, no commas, no quotation marks. You get one sentence. On the red. Oh, I get one sentence? Yes. I believe the court committed plain reversible error. The lack of an objection in the district court should not—I think we can overcome that very difficult burden. Thank you, sir. See, you did it.  Thank you, counsel. Ms. Doherty, your question? Thank you.